David Karl Gross, ABA #9611065
Mara E. Michaletz, ABA #0803007
Birch Horton Bittner & Cherot
1127 W. Seventh Avenue
Anchorage, AK 99501
Telephone: 907.276.1550
Facsimile: 907.276.3680

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| HAS AVIATION, LLC,<br><br>    Plaintiffs,<br><br>vs.<br><br>XTO ENERGY, INC. and SCOTT GRIFFITH,<br><br>    Defendants. | Case No.: 3:15-cv-00200-HRH |

## THIRD AMENDED COMPLAINT

COMES NOW Plaintiff, HAS Aviation, LLC ('HAS") pursuant to Federal Rule of Civil Procedure 15(a) and the stipulated dismissal of former plaintiff Pathfinder Aviation, LLC [Docket No. 52] as approved by the Court's February 9, 2017 Order [Docket No. 53], by and through undersigned counsel of record, and hereby files a third amended complaint:

## PARTIES AND JURISDICTION

1. HAS is a limited liability company formed under the laws of the State of Alaska with its principal place of business in the State of Alaska.

HAS V. XTO, GRIFFITH      CASE NO. 3:15-CV-00200-HRH
THIRD AMENDED COMPLAINT      PAGE 1 OF 20
507468\1\00589355
Case 3:15-cv-00200-HRH    Document 55    Filed 02/16/17    Page 1 of 20

2. Defendant XTO Energy, Inc. ("XTO") is a corporation organized under the laws of the State of Delaware, with its principle place of business in the State of Texas or a state other than Alaska.

3. Defendant Scott Griffith ("Griffith") was, at all times relevant hereto, employed by XTO and therefore, all the acts and omissions of Griffith, as described herein, will be imputed to XTO. XTO has likewise admitted that Griffith was acting within the course of his employment at all relevant times.

4. At all relevant times hereto, Griffith had actual and implied authority to bind XTO, including the authority to sign contracts on behalf of XTO. Further, Griffith represented to Pathfinder, in both words and conduct, that he was fully authorized to bind XTO, including the signing of contracts, and therefore, he also had apparent authority to act on behalf of XTO.

5. Jurisdiction is proper in the District Court for the District of Alaska pursuant to 28 U.S.C. 1332. Venue is proper pursuant to 28 U.S.C. 1391(b)(1) and (2).

## **GENERAL ALLEGATIONS**

6. HAS incorporates by reference paragraphs 1-5 of this Complaint as if fully set forth herein.

7. XTO is a subsidiary of ExxonMobil ("Exxon"). Its Alaska Operations focused on oil production in the Cook Inlet and was based in Nikiski and Kenai, Alaska. At all times relevant hereto, Griffith served as the production superintendent for the Alaska Operations Division of XTO.

HAS V. XTO, GRIFFITH
THIRD AMENDED COMPLAINT
507468\1\00589355
Case 3:15-cv-00200-HRH Document 55 Filed 02/16/17 Page 2 of 20

CASE NO. 3:15-CV-00200-HRH
PAGE 2 OF 20

8. Pathfinder Aviation, LLC (formerly Pathfinder Aviation, Inc.) is a Homer-based provider of helicopter services and logistical support pursuant to FAA Parts 133, 135 and 137, providing services to the oil and gas, mining and construction industries.

9. Until the last quarter of 2016, and at all times relevant hereto, Pathfinder was owned by Michael and Mary Fell. At all relevant times, Michael Fell ("Fell") served as its president.

10. During the last quarter of 2016, Fell sold Pathfinder to Dos Rios Partners, a Texas-based private equity firm. Part of the sale required Fell to maintain this lawsuit as his own individual asset, and Fell created HAS to act as the entity that would own the asset and continue with the lawsuit, after which all rights, claims, and obligations related to this suit were assigned from Pathfinder to HAS. Thus, when referenced below, HAS owns and assumes all allegations by Pathfinder, the aviation company which engaged with Defendants at all times relevant hereto.

11. Pathfinder specializes in remote operations and extreme climates. In particular, Pathfinder is often hired by oil industry clients to transport employees to various locations throughout Alaska, from oil platforms in Cook Inlet to oil exploration sites in Northern Alaska.

12. On June 4, 2014, XTO reached out to Pathfinder to explore the possibility of hiring it to support its Alaskan operations because it was not happy with its current provider of transportation services. This inquiry began a review process whereby Exxon examined Pathfinder's entire program with the goal of determining whether it would hire Pathfinder. This included a number of inspections and a

complete review of all of Pathfinder's operations, safety protocol, maintenance and manuals.

13. In furtherance of this review process, Fell and Griffith met in January 2015 to discuss the acquisition of a specific helicopter airframe that met XTO's particular contract requirements: An Airbus EC135P2+ ("Airbus EC"). Thereafter, XTO's aviation management team met with Pathfinder to perform a "gap analysis" of Pathfinder's assets and services, after which XTO determined that Pathfinder qualified as an acceptable vendor.

14. During February 2015, Fell and Griffith exchanged several emails which discussed the fact that Pathfinder had located an Airbus EC, which was pending Exxon's approval. The two also communicated both directly and via email regarding several contract terms, including the length of the contract, Pathfinder's request for a termination clause, and Pathfinder's monthly and hourly rates for transportation services.

15. On February 25, 2015, Griffith and Fell had a telephone conversation wherein Griffith announced that Pathfinder had been awarded the contract and would be XTO's transportation services provider. Griffith further stated that the contract would commence on September 1, 2015, but that Pathfinder needed to build the necessary infrastructure before the start date in order to perform under the contract.

16. Griffith sent an email to follow up on their conversation, which stated, "XTO Energy has made the decision to go with Pathfinder Aviation as our helicopter support contractor for our Alaska Operations. I will begin working immediately to put the contract together under the terms we have discussed. Once a draft of the

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

contract has been completed, I will send it to you for your review [and] then a final contract will be put in place for approval [and] signature by both, XTO Energy Inc. and Pathfinder Aviation."

17.  Griffith's February 25, 2015 email, which was copied to three other XTO employees in supervisory positions, included the agreed-upon 10-year term, with the option of up to five one-year extensions.  The contract was to commence September 1, 2015; XTO would pay Pathfinder a rate of $176,636 per month plus $1,100 per flight hour "dry," meaning excluding the price of fuel.

18.  The February 25, 2015 email also included details regarding a start-up fee of $50,000 and a termination clause.  The start-up fee and termination clause were of particular importance because it gave Pathfinder a measure of protection by requiring 180 days written notice, meaning that XTO would have to pay a minimum of $1,109,816 in the event XTO simply cancelled or suspended the contract.

19.  The terms of the contract further specified that Pathfinder would provide XTO a helicopter "that meets all the requirements outlined by the ExxonMobil Aviation Operation Guidelines (AOG) and the International Association of Oil & Gas Producers, Aircraft Management Guidelines (OGP)."  The terms further stipulated that "XTO Energy will work closely with Pathfinder Aviation [and] our ExxonMobil aviation advisor(s) to ensure that we succeed in meeting the requirements outlined by these two documents."

20.  The February 25, 2015 email also confirmed that XTO Energy planned to enter into an additional agreement with Pathfinder whereby if the primary helicopter -- the Airbus EC -- was taken off the XTO contract in support of other

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

aviation clientele or for repairs and maintenance, XTO would pay for the use of a twin-engine Bell 212 helicopter for back-up, up to the first 12 months of the contract.

21.     The February 25, 2015 email further indicated that XTO was about to notify its then-current helicopter provider, ERA Helicopters, that it would be terminating its contract and "going in another direction." Such a termination indicated a clear commitment to award the contract to Pathfinder, as XTO could not operate without the transportation services being offered by Pathfinder.

22.     After the February 25, 2015 confirmation email and over the course of the spring 2015, Pathfinder worked to acquire the additional aircraft and to arrange for modifications to conform to XTO's operation guidelines. These modifications involved substantial labor, time and resources. Pathfinder also purchased ground support equipment, helicopter support equipment, and devoted hundreds of labor hours into ensuring that Pathfinder's personnel and equipment complied with XTO's requirements and needs. These expenses, training and labor are estimated to have cost Pathfinder over $400,000. Pathfinder would never have expended this capital and these resources had there not been a binding and enforceable contract in place with XTO.

23.     Over the course of spring 2015, Fell and Griffith worked together on the minor remaining details of the contract between XTO and Pathfinder. They also worked together to ensure the modifications, training and arrangements were to XTO's standards and requirements. Griffith continually communicated to Fell that there was an enforceable and binding contract in place, including the following: An email Griffith sent on March 23, 2015, wherein he made clear that there was a

binding contract in place with the use of quotations; an email Griffith sent on April 30, 2015, reiterating the existence of a "ten year contract;" and numerous verbal conversations where Griffith repeatedly assured Fell that the contract between XTO and Pathfinder was binding and enforceable.

24. While the parties clearly understood that there was a contract in place, and were working diligently pursuant to the terms of that contract, XTO delayed in signing the actual written contract. On February 25, 2015, when Pathfinder was awarded the contract, Griffith said that he would "immediately put the contract together" and that the final contract would be signed thereafter. Despite this representation, Griffith failed to "immediately" present the final written contract to Pathfinder. It was not until May 8, 2015, over two months later, that Griffith finally emailed the final contract to Pathfinder for signature, and then only after being continually requested to do so by Pathfinder. Despite having the final written contract in place, Griffith did not sign the agreement in the months that followed, and ultimately never signed the document.

25. In short, Griffith initially represented that he would have the contract finalized and signed within a matter of weeks, if not days, but instead failed to sign the contract during a period of over four months. This timeline leads to the reasonable inference that Griffith and XTO were intentionally delaying the signing of the written contact. If this were not the case, the contract would have been signed at some point in early March 2015.

26. While Pathfinder was diligently working on building the infrastructure needed to perform under the contract, XTO was in active negotiations with Hilcorp

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

Energy, Inc. ("Hilcorp") regarding the sale of all of XTO's assets in Alaska, a fact that was not disclosed to Pathfinder. On information and belief, these discussions started in late 2014, and were in full swing by January 2015, prior to Pathfinder being awarded the contract with XTO. Typically, when a company enters into a non-disclosure agreement for the purpose of discussing the terms of a settlement, such discussions take upwards of a year to complete, especially when, as here, the sale includes considerable assets and regulatory approval.

27. In these discussions, Hilcorp sought to acquire XTO's two offshore platforms and a tank facility with corresponding offices. Such a sale, if it were finalized, would see XTO leave the Alaskan marketplace, meaning that it would no longer need the transportation services that were to be provided by Pathfinder.

28. XTO made a concerted effort not to make these negotiations public, and actively hid these negotiations from Pathfinder because it wanted Pathfinder to continue to build the infrastructure needed to support the transportation services contract in the event the sale with Hilcorp fell through and these transportation services were needed. XTO was afraid that if Pathfinder knew that XTO would likely soon be out of the Alaskan marketplace, it would stop its efforts to build the necessary infrastructure.

29. Because Pathfinder was unaware that XTO was considering a sale to Hilcorp, it continued to work on putting the necessary equipment in place to support the contract, including the purchase of a Bell 212 helicopter for over $1.2 million. Pathfinder also located an Airbus EC that met XTO's standards and requirements, with a purchase price of over $3.5 million.

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

30. Just prior to purchasing the Airbus EC, Fell received a call from a Hilcorp representative ("Hilcorp Representative") who was close to the negotiations between Hilcorp and XTO. Fell had a good and professional relationship with the representatives of Hilcorp because Pathfinder provided transportation services to Hilcorp. While the Hilcorp Representative did not inform Fell that Hilcorp was about to purchase XTO, he did instruct Fell to be very careful when dealing with XTO and committing resources to Pathfinder's contract with XTO. The Hilcorp Representative hinted that Fell needed to do whatever was necessary to ensure that XTO understood there was an enforceable contract in place.

31. In retrospect, it is apparent that the Hilcorp Representative knew that Hilcorp was going to purchase XTO and that once the sale went through, Pathfinder would no longer be needed and XTO would claim that no contract existed. The Hilcorp Representative was effectively warning Fell that XTO intended to, or would likely, breach the contract.

32. Based on the content of the conversation between Fell and the Hilcorp Representative, a reasonable inference can be drawn that XTO and Hilcorp discussed the Pathfinder contract during their negotiations. On information and belief, Hilcorp told XTO that it did not need the transportation services being provided by Pathfinder in its contract with XTO and it did not want to assume the obligation to pay $176,636 a month as specified in the contract. At this point, Hilcorp already had its own helicopter and transportation services agreement with Pathfinder and therefore did not need the transportation services Pathfinder was providing to XTO. As such, Hilcorp would not have wanted to assume the contract with Pathfinder.

33. In order to avoid this problem, and to facilitate the negotiations between Hilcorp and XTO, it is believed that XTO told Hilcorp that it could get out of the contract with Pathfinder and that the contract should not be an impediment to the sale. On information and belief, XTO explained that there was no signed contract and therefore it was XTO's intent to avoid the contract by claiming that no contract existed because of the lack of signature. Because of the loyalty Hilcorp had to Pathfinder, it was at this point that the Hilcorp Representative called Fell to warn him of this development.

34. Due to the significant cost of the Airbus EC, and the uncertainty created by Fell's conversation with the Hilcorp Representative, Fell contacted Griffith on or about June 20, 2015, to further discuss the purchase of the Airbus EC and to again confirm the agreement between the two parties. Fell asked Griffith if they had an enforceable contract in place and Griffith assured Fell that the contract between the two parties was enforceable and binding and that he should proceed with the purchase of the Airbus EC pursuant to the terms of the contract.

35. Again, because of the cost of the Airbus EC and the conversation with the Hilcorp Representative, Fell asked Griffith a second time if the contract was binding, and explained that XTO's act of walking away from this contract "had the potential to put him out of business." Griffith again stated that the contract was enforceable, by responding as follows: "Mike, this contract is solid."

36. Because of the significance of the sale of XTO's assets in Alaska, because of Griffith's supervisory position with the company, because it is difficult to conceal such information from employees of a company being sold, and because

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

Griffith would be significantly impacted by the sale, including having to move to another state, Griffith was fully aware that there were discussions taking place between XTO and Hilcorp. Due to the typical length of these complicated negotiations, Griffith became aware that Hilcorp was contemplating the purchase of XTO's Alaskan assets as early as January 2015.

37. Therefore, Griffith knew that there was the possibility that XTO would be leaving the Alaskan marketplace and would no longer need Pathfinder's services. Despite this, Griffith continually and repeatedly assured Fell that the contract was enforceable and failed to disclose to Fell anything related to the possible sale of XTO. At the time Griffith told Fell to proceed with the purchase of the Airbus EC, on or about June 20, 2015, he knew XTO would later claim that the contract was no good for a number of reasons, including that there was no signed contract.

38. On July 1, 2015, a little over a week after Pathfinder's purchase of the Airbus EC, and a little more than a week after Griffith assured Fell that the contract was enforceable and "solid," XTO announced that it had sold its Alaska operations to Hilcorp. Because it is typical to have most of the terms worked out in advance of an announcement, the actual date that XTO agreed to sell its Alaska assets to Hilcorp was on or about June 20, 2015, which is about the same date the Hilcorp representative called Fell to warn him about Pathfinder's contract with XTO.

39. Griffith called Fell and told him that XTO would not be going forward with its contract with Pathfinder. In an email dated July 2, 2015, Griffith admitted that there was a "contract" with Pathfinder, but XTO would not be going forward with it "due to the sale of [XTO's] Alaska assets."

40. After this communication, Fell attempted to contact Griffith and XTO regarding the contract, but to no avail. Griffith's failure to respond to him was, in part, due to the embarrassment he felt for stringing Fell along and then abandoning him once the sale with Hilcorp had gone through. XTO's next communication with Fell occurred over six weeks later, in late August 2015, after XTO had received a letter from Pathfinder's counsel.

41. Since XTO's communication indicating that it would not agree to the terms of the contract, and in order to avoid a monthly payment in excess of $40,000 to support and maintain the helicopters, Pathfinder sold the Bell 212 helicopter at a loss of over $140,000, and Pathfinder has been making every effort to sell the Airbus EC, but has not yet been successful. It is anticipated that due to the unique nature of the Airbus EC, which is a result of Exxon's unusual specifications, the aircraft will likely be sold for a loss of over $1 million.

## COUNT I
## BREACH OF CONTRACT AGAINST XTO

42. HAS incorporates by reference paragraphs 1-41 of this Complaint as if fully set forth herein.

43. In February 2015, Pathfinder and XTO entered into a binding and enforceable contract, which encompassed all essential terms, provided for adequate consideration, with unequivocal acceptance by the parties, and which manifested XTO's intent to be so bound.

44. The contract required Pathfinder to provide XTO with transportation services using an Airbus EC, as well as a back-up helicopter, in exchange for

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

compensation, which included monthly and flight-hourly rates for a term of ten years, with several extensions.

45. As a result of this contract, Pathfinder purchased two helicopters at a cost of over $5 million, and spent hundreds of thousands of dollars in ensuring that the necessary infrastructure was in place to deliver the services it agreed to provide.

46. XTO's refusal to honor its contract with Pathfinder amounts to a breach of contract, which damaged Pathfinder and HAS, including but not limited to direct, indirect, general, special and consequential damages, and including the loss of the contract itself, the exact amount to be proven at trial.

## COUNT II
## BREACH OF QUASI-CONTRACT AND QUANTUM MERUIT AGAINST XTO

47. HAS incorporates by reference paragraphs 1-46 of this Complaint as if fully set forth herein.

48. Pathfinder provided time, resources and equipment, and made numerous investments, in order to fulfill the requirements set forth in the contract with XTO, and XTO's acceptance and appreciation of these investments under the circumstances makes it inequitable to do so without paying Pathfinder.

49. Pathfinder's investments and costs were made in reasonable reliance on XTO's promise to enter into a contract, or XTO's promise to negotiate in good faith to form a contract, and XTO thereafter broke those promises.

50. This unjust enrichment damaged Pathfinder and HAS, including but not limited to direct, indirect, general, special and consequential damages, and including the loss of the contract itself, the exact amount to be proven at trial.

HAS V. XTO, GRIFFITH  
THIRD AMENDED COMPLAINT  
507468\1\00589355  
CASE NO. 3:15-CV-00200-HRH  
PAGE 13 OF 20  
Case 3:15-cv-00200-HRH   Document 55   Filed 02/16/17   Page 13 of 20

BIRCH HORTON BITTNER & CHEROT  
ATTORNEYS AT LAW  
1127 WEST SEVENTH AVENUE  
ANCHORAGE, ALASKA 99501-3301  
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

## COUNT III
## PROMISSORY ESTOPPEL AGAINST XTO

51. HAS incorporates by reference paragraphs 1-50 of this Complaint as if fully set forth herein.

52. XTO made a promise to Pathfinder that it had been chosen as XTO's helicopter support contractor for its Alaskan Operations.

53. XTO's promise induced Pathfinder to act in a manner that was both reasonably foreseeable and actually foreseen by XTO. Pathfinder's actions amounted to a substantial change in its position, and as such, the enforcement of XTO's promise is necessary to ensure the interests of justice.

54. Pathfinder's reasonable and foreseeable reliance on XTO's promise damaged Pathfinder and HAS, including but not limited to direct, indirect, general, special and consequential damages, and including the loss of the contract itself, the exact amount to be proven at trial.

## COUNT IV
## NEGLIGENT MISREPRESENTATION AGAINST XTO AND GRIFFITH

55. HAS incorporates by reference paragraphs 1-54 of this Complaint as if fully set forth herein.

56. XTO and Griffith made numerous representations to Pathfinder in order to induce Pathfinder into believing that there was a binding and enforceable contract in place to provide transportation services. All such representations were made in the course of the business dealings between XTO and Pathfinder and all such representations concerned the contract between XTO and Pathfinder.

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

57. These numerous representations to Pathfinder include, but are not limited to, the following:

    a. The verbal representations made by Griffith to Fell on February 25, 2015, indicating that Pathfinder was awarded the contract;

    b. The representations made in the email dated February 25, 2015 whereby Griffith announced that Pathfinder was awarded the contract for transportation services and outlined the terms of the contract;

    c. The email dated March 23, 2015, where Griffith suggested by the use of quotations that the contract was final and enforceable;

    d. The email dated April 30, 2015, where Griffith indicating that an enforceable contract existed; and

    e. All of the verbal communications between Griffith and Fell from February 25 until July 1, 2015, wherein Griffith stated there was an enforceable contract between XTO and Pathfinder, including the conversation between Griffith and Fell on or about June 20, 2015 where Griffith told Fell that the contract was "solid."

58. All of these representations contained false information when they were made because XTO claims that there was never an enforceable contract in place and that it never agreed to purchase transportation services from Pathfinder. Therefore, each and every time Griffith told Fell that there was an enforceable contract in place, whether such statements were made verbally or in writing, a false statement or misrepresentation resulted.

HAS V. XTO, GRIFFITH                                                                  CASE NO. 3:15-CV-00200-HRH
THIRD AMENDED COMPLAINT                                            PAGE 15 OF 20
507468\1\00589355
Case 3:15-cv-00200-HRH   Document 55   Filed 02/16/17   Page 15 of 20

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

59. All of these representations were made without reasonable care or competence because each time Griffith communicated to Pathfinder that there was an enforceable contract in place, these representations were false due to XTO's belief that no contract ever existed.

60. For example, when Griffith told Fell to proceed with the purchase of the Airbus EC and that the contract was "solid," he knew that XTO's assets were either sold, or would soon be sold, to Hilcorp, considering that the sale of XTO to Hilcorp was announced a little over a week later. Considering the small amount of time between Griffith telling Pathfinder to go ahead with the purchase of the Airbus EC and the announcement of the sale, Griffith most certainty knew that XTO would not need Pathfinder's services at the time he told Fell the contract was "solid."

61. This claim is also supported by the conversation between Fell and a Hilcorp Representative, who had knowledge of the sale negotiations between Hilcorp and XTO. The Hilcorp Representative warned Fell to make sure he solidified Pathfinder's contract with XTO, which is a clear indication that XTO had told Hilcorp during the course of its negotiations that it intended to walk away from its agreement with Pathfinder. With this knowledge in hand, Griffith lied to Fell and told him that the contract was "solid" and that he should proceed with the purchase of the Airbus EC.

62. All of the representations made by XTO and Griffith suggesting that there was an enforceable contract in place were false at the time they were made because during this entire timeframe XTO was actively trying to sell its Alaska assets to Hilcorp, knowing that to do so would mean that it would abandon the contract with Pathfinder. Each time that XTO and Griffith communicated with Pathfinder and

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

promised that the contract was enforceable, binding and "solid," they knew these representations were not accurate because of XTO's desire to sell its Alaskan operation, which would not have included the Pathfinder contract.

63. Further proof for the existence of these misrepresentations is the fact that XTO and Griffith refused to sign the contract in a timely manner. Initially, Griffith stated that he would put the contract together "immediately," which suggests that the contract would be signed in a matter of days. However, despite being repeatedly requested to do so, XTO and Griffith stalled the signing of the contract for a period of over four months, which leads to the reasonable inference that XTO was intentionally delaying the signing of the contract and that this delay was done in order to claim that the contract was unenforceable because it was not signed.

64. Pathfinder justifiably relied on the representations made by XTO and Griffith and reasonably concluded that an enforceable and binding contract for transportation services was in place.

65. The actions of XTO and Griffith amount to negligent misrepresentations, which caused Pathfinder and HAS damages including, but not limited to, direct, indirect, general, special and consequential damages, and including the loss of the contract itself, the exact amount to be proven at trial.

## COUNT V
## VIOLATION OF ALASKA'S UNFAIR TRADE PRACTICES ACT
## AGAINST XTO AND GRIFFITH

66. HAS incorporates by reference paragraphs 1-65 of this Complaint as if fully set forth herein.

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

67. XTO and Griffith were engaged in trade or commerce in the State of Alaska that falls within the scope of AS 45.50.471, *et seq.*

68. XTO and Griffith engaged in unfair and deceptive practices, including but not limited to, the following: Misrepresenting their intent to contract with Pathfinder for its services; representing that Pathfinder's services had approval and status that it did not have; engaging in conduct creating a likelihood of confusion or misunderstanding which misled, deceived and damaged Pathfinder in connection with the sale of goods and services, specifically transportation services; and knowingly making false or misleading statements concerning the existence of a contract.

69. Additionally, the conduct of XTO and Griffith constituted deception, fraud, false pretense, false promise, misrepresentation or knowing concealment, suppression or omission of a material fact with the intent that Pathfinder would rely upon the concealment, suppression or omission in connection with the sale of goods and services, specifically transportation services.

70. The unfair and deceptive conduct, over and above a mere breach of contract, included the fact that XTO and Griffith consistently and repeatedly made representations to Pathfinder that there was an enforceable contract in place, when these representations were false. For example, when Griffith called Fell on or about June 20, 2015 and told him that the contract was "solid," he was well aware of the fact that XTO had either been sold, or would soon be sold, to Hilcorp, as the sale was announced a little over a week after this conversation.

71. In addition, considering that the Hilcorp Representative close to the negotiations between XTO and Hilcorp called Fell and told him to be careful when dealing with XTO, this demonstrates that XTO had told Hilcorp that it planned on abandoning its contract with Pathfinder, meaning that XTO lied to Pathfinder, or at the very least provided incomplete or inaccurate information. The Hilcorp Representative's call to Fell was prompted by XTO indicating that it would not honor its contract with Pathfinder.

72. Further, XTO's unwillingness to sign the written contract for a period of over four months, when it initially stated that the contract would be signed "immediately," demonstrates that XTO knew it was going to be sold to Hilcorp, and would thus not honor the contract, but refused to sign the contract, thinking it could use an unsigned contract as a means to avoid the contract.

73. All of the unfair and deceptive acts and practices undertaken by XTO and Griffith, as described above, caused damages, including, but not limited to, direct, indirect, general, special and consequential damages, and including the loss of the contract itself, the exact amount to be proven at trial.

74. As a result of these unfair and deceptive acts and practices as described herein, XTO and Griffith are liable for treble damages and the payment of actual reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff HAS prays for the following relief against Defendants, XTO and Griffith:

1. Compensatory, consequential and punitive damages in an amount to exceed $100,000, the exact amount to be proven at trial;

2. Treble damages per AS 45.50.471, *et seq.*;

3. Actual attorneys' fees and costs;

4. Pre-judgment and post-judgment interest; and

5. Such other and further relief as this Court deems just and equitable.

DATED this 16th day of February, 2017.

> BIRCH HORTON BITTNER & CHEROT
> Attorneys for Plaintiff
>
> By: /s/ David Karl Gross
> David Karl Gross, ABA #9611065
> Mara E. Michaletz, ABA #0803007
> Email: dgross@bhb.com
> mmichaletz@bhb.com

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 16th day of February, 2017, a true and correct copy of the foregoing was served on the following via the CM/ECF electronic delivery system:

Ms. Barat M. LaPorte
Oles Morrison Rinker & Baker LLP
laporte@oles.com

BIRCH HORTON BITTNER & CHEROT

By: /s/ David Karl Gross

BIRCH HORTON BITTNER & CHEROT
ATTORNEYS AT LAW
1127 WEST SEVENTH AVENUE
ANCHORAGE, ALASKA 99501-3301
TELEPHONE (907) 276-1550 • FACSIMILE (907) 276-3680

HAS V. XTO, GRIFFITH
THIRD AMENDED COMPLAINT
507468\1\00589355
CASE NO. 3:15-CV-00200-HRH
PAGE 20 OF 20
Case 3:15-cv-00200-HRH   Document 55   Filed 02/16/17   Page 20 of 20